Good afternoon, Your Honors. May it please the Court. This case arises out of five articles published by my client, IPVM, in March, April, and May of 2020, just as COVID-19 was beginning to grip the country. At the time, a surge of purported remote fever detection systems were being rushed to market, and IPVM reviewed and provided its views about a number of those systems, including Appeli's so-called fever system. Taking into account all of the information available to it at the time about the fever system, including all of the information provided to it by Appeli, IPVM reached the conclusion that fever was not sufficiently accurate to do what it was being expressly marketed and sold to do, effectively and reliably detect individuals with a fever in a crowd in real-world conditions, like airports and concert venues, in order to help curb the spread of COVID-19. IPVM's conclusions... Judge Collins, you're muted. Sorry. Isn't that conclusion that you just It's not, Your Honor. The situation here is distinguishable from Unelco, primarily because, as this Court pointed out in Yagman, Unelco is not a case about a conclusion drawn from expressly stated true facts. It's the bare assertion, this didn't work, with no factual basis outlined for that conclusion, which is what made it potentially false, potentially actionable. This case is different, because it involves conclusions drawn from a set of stated facts that are expressly stated in the articles, all of which form the basis for IPVM's conclusion, and the articles themselves, it's clear, don't imply any additional undisclosed unstated facts upon which they're based. So it's our position, Your Honor, that fundamentally, these are opinions, they're conclusions based on expressly disclosed facts, they can only be actionable if the underlying facts themselves are false, which they are not, and alternatively, even if this Court wanted to look at that conclusion as though itself, it was a factual statement that's provably false or true, it has to conclude, and the District Court erred by not even reaching this question, it has to conclude, based on the allegations of the amended complaint itself, that they're substantially true statements of fact. In other words, there are sort of only two options here. It's either a protected opinion based on fully disclosed accurate facts, or it's a statement of fact, but it's substantially true based on the allegations of the amended complaint itself. So in this case, it's very different from UNALCO. And I'll emphasize, Your Honor, I think, I'd like to emphasize, I think this is the second piece of that, the alternative argument, that even if this Court were to treat the statement that the feeder system is not sufficiently accurate for the use for which it is being an opinion based on accurate disclosed facts, but as though were itself a provably false or provably true statement of fact, the allegations of the amended complaint demonstrate that it's substantially true. The amended complaint... Do you agree that for purposes of analyzing that issue, and the second prong of the SLAPP test, that the relevant standards are just the traditional 12b6 standards? That's correct, Your Honor. And if you look at, that's why I think we focused in our briefing on treating the allegations of the amended complaint as though they are true for purposes of this motion. So from that perspective, the SLAPP aspect is sort of dropped out of the underlying decision that's being appealed from is the denial of a motion to strike under California's anti-SLAPP law. It's true that the first prong of that analysis is not disputed by a Pelley. So the only question here, I think this is what Judge Collins you're getting at, the only question here is whether or not that second prong has been met, whether or not a Pelley demonstrated a reasonable probability of prevailing on the merits. And this Court, under its precedent in Planned Parenthood, applies a Rule 12b6 standard to that. Does that create a jurisdictional problem? I mean, because the California legislature can't tell us when we hear an interlocutory appeal. And so this is an appeal from a denial of a 12b6, pure and simple. And we do the SLAPP cases on the collateral order doctrine apply when all the SLAPP elements are stripped out and it's a pure 12b6. The cases are legion that say that 12b6 does not, denial of a 12b6 straight out does not satisfy the collateral order doctrine because it's not, by definition, it's not separable from the merits. It is the merits. This Court's precedent, or this Court's precedent, including in Planned Parenthood and Hilton against Hallmark Cards, makes very clear that when it's an appeal from a denial of a motion to strike under California's anti-SLAPP law, which is precisely what we have here, that this Court does have jurisdiction and reviews those denials pursuant to the collateral order doctrine. Our case law may or may not be right, but that's our case law. That's correct, Your Honor. I understand there's a dispute across the country about the extent to which anti-SLAPP provisions apply in federal court and diversity cases. But absent en banc review or a decision from the Supreme Court stating otherwise, that is the binding precedent in this circuit. Counsel, if I could interject a question, please. Is there any, tell me if there's significance, if any, to the fact that the public has some interest in receiving a critique of the efficacy of the device that was being sold by XLAPS? I think there is significance, Your Honor, because I think this is a really key point. To conclude that IPVM's conclusions about the fever system are not protected opinion based on disclosed facts, to adopt the view of the district court or the view that's being urged by the appellee would call into question First Scientific analysis for product reviews from publishers like Consumer Reports that routinely make predictions, predictive judgments, I would say, about the real-world efficacy of new products based on the facts available to it at the time, including the product's components, its specifications, and the marketing claims of its manufacturer. It would be intolerable from a First Amendment perspective for commentary like that. Discourse that the California courts have of particular value to the public to be deemed actionable in defamation. Let me suppose this is a hypothetical, so I'm going to make the facts much cleaner than what seems to be alleged here, but let's assume that your client had said the accuracy claims made for this fever program are wildly off. There's no possible way that the accuracy claims can be true. What happens with, I mean, at what point do we get to knock these things out? I mean, I understand your point about protecting Consumer Reports. The other things we're very familiar with, I'm not familiar with your company until I got to this lawsuit, but we do want to be able to preserve the ability of having evaluations done by neutral evaluators and so on. What you're asking for is to knock this suit out early rather than have to defend the suit as if it were just an ordinary lawsuit. So, how quickly do you get to knock them out is the problem? I mean, it seems to me, at least arguably, that your evaluated the product when it says it's inaccurate. I think, Your Honor, I mean, this is a question of law that is reviewed by the courts de novo. Courts have traditionally looked at these, even setting aside the anti-SLAPP statute, courts on motions to dismiss under Rule 12b-6 have traditionally looked at these issues or these types of cases that present a real risk of chilling effect under the First Amendment quite closely at the pleading stage, and so I think there is important First Amendment dismissal of these cases at the earliest possible stage. And to be clear, Your Honor, I don't think we're asking for something out of the ordinary. I think it's evident from the allegations of the amended complaint, from the articles themselves, when taken in context, their general and specific context, the statements that are being challenged by Apelli here are clear. It is clear to any reasonable reader of those statements that what they are expressing is IPVM's conclusions based upon the stated facts that are detailed in the articles. And I think... Well, I'm not sure that that's right. What about the statement about the license agreements? Isn't that just either true or false, straight up or down? Not really a conclusion based on facts stated. Well, I think it is factually accurate that the FLIR SDK license agreement prohibits its use for this type of medical screening purpose. That is a factual statement. It is one of the facts that my client, IPVM, based its ultimate conclusion that this product would not be sufficiently, would not perform sufficiently accurate for the purpose for which it is being being offered. So I think there are facts. I don't think we would dispute that there are facts set forth in the articles, including that the fever system lacked FDA approval. The claim about the license agreement, that would be your only defense there is substantial truth. You're not claiming that's a statement of opinion. We're not claiming that the statement that the FLIR SDK, which is a factual, accurate statement, prohibits the use of the, that FLIR prohibits use of the FLIR SDK for purposes, for these types of purposes. We're not arguing that's an opinion. I think that the gist of that, to be quite candid, Your Honor, the gist of that, it goes to the position that IPVM or the point that IPVM stated sort of throughout its articles that it thought was highly relevant to whether or not this fever system could be used adequately or would be sufficiently reliable for these purposes. The notion that FLIR, that is the manufacturer of the thermal screening component of the fever system, the camera, said repeatedly that this camera should not be used for this purpose based on its well-established accuracy range of plus or minus 5.8 degrees Fahrenheit, which is a massive range for the measurement of human body temperature. It's well exceeds the difference between a fever and a normal body temperature. I want to emphasize, Your Honor, that on the substantial truth point, I want to highlight the fact that even the amended complaint's own allegations allege that when viewed or when tested in optimal conditions, that's not our terminology, that's what the amended complaint itself alleges, that these were optimal conditions, controlled environment, controlled temperature subjects, controlled airflow. Even under those conditions, this fever system performed only with an accuracy of 1.8 degrees Fahrenheit of an approved FDA system. 1.8 degrees Fahrenheit, Your Honor, is the difference between a fever and a normal body temperature. It far exceeds the claims that fever was making in its marketing materials of plus or minus 0.4 degrees Fahrenheit, and it far exceeds FDA standards. An FDA standard for this type of device is 0.5 degrees Fahrenheit. On that basis alone, it can't be demonstrated that my client's conclusion that this was a product that lacked sufficient accuracy to be used for this purpose is substantially false. I'd like to reserve the remainder of my time for rebuttal. That's fine. Thank you. I'm going to hear from Mr. Zarny for a penalty. Good afternoon. May it please the Court. We would like to focus the district court's order that given IPVM's serious tone, the technical reviews that are challenged in the defamation suit are considered assertions of fact. And that's under the, you know, the Ninth Circuit precedent that's cited in the response, in the, sorry, Eppley's brief. For instance, the Gardner and Partington are cases where the defendant's statements were clearly opinions from context. Here, as expert commentary in a serious technical review, they were not. And, of course, seriousness alone, you know, does not, seriousness alone is not sufficient to say that something is an assertion of fact, but, and to convince the readers that they're making factual assertions rather than opinions. But it's the seriousness with no indication that the assertions are opinions that does make the readers believe that the authors are making factual assertions. Appellants cited this court that it is overreach to advocate for a rule that opinion statements by experts are automatically actionable. And, of course, that's true, because an expert can make clear, you know, in consumer reports that the statement is merely an opinion. Well, what about the statement that the advertising was aggressive? Isn't that a statement of opinion? That does appear to be a statement of opinion. That's correct. It's different than the technical assertions that were made by Eppley. What about that it was misleading? A statement of opinion? Misleading could be a statement of opinion. It would depend on the context. Here I would argue that it was more of a factual assertion because it was based, you know, as Eppley argues, I'm sorry, as Appellant argues, it was based on facts, the factual assertions that, you know, that they're then saying are misleading because of specific facts. But that's something that is more of a gray area, saying that something is misleading. It's here where the statements did not make clear at all that they are merely opinions, that they are actionable. And that's what the district court found. You know, for instance, in Overstock's case, what was important to the analysis was not that the defendant had a bias, but that, like Appellant, it held itself out as having no bias. And that's what Appellant did in this case. The rest of our arguments are presented in respondent's briefs. This court has no further questions. Oh, no, I have a question about the substantial truths question. What's your response to counsel's assertion that with a one degree Celsius margin of error, it was both substantially true to say that the product wasn't sufficiently accurate and to say that false positives and negatives would be highly likely? Those are factual assertions for substantial truth that would need to be, a jury would need to find, or a fact finder would need to find. No, you're suing someone, you know, for defamation based on a product review. So you need to plead facts that establish that the review is in fact false. But your falsity allegations in the complaint rest, as far as I can tell, and you correct me if I'm wrong, on this one analysis done with 10 people under what you described as optimal conditions. And even then it was a one degree Celsius error rate. How does that establish that these are not substantially true? Well, the FLE's assertions were much larger than that, that there was a much larger degree of error rate. And that would come into play, for instance, if a temperature, let's say that it recorded a temperature of 102. So if there's a one degree difference, there would still be a fever. However, if there's a five degree difference, there would not be. Well, but I thought the ranges that you have in terms of average caution, approaching fever temperature needs additional screening. Some of the cutoffs in those ranges are quite small. So the approaching fever range is 36 to 36.5 Celsius and needs additional screening is 36.9 degrees Celsius and higher. And one degree Celsius swallows the entire approaching fever range and part of the needs additional screening. That seems to suggest right away there's going to be a lot of false positives or false negatives. But a number of false positives and negatives would differ vastly, whether we're talking about a more narrow range or a broader range. And, of course, that's something that they could work on to improve. This question right now is before… Did you plead facts to show with that margin of error rate that it's false to say that they're highly likely? Well, first of all, I apologize. I'm not the district court counsel. I've just been taking the appeal. But, yes, the district court counsel did indeed plead those facts. How? I don't see how this study establishes that. If it has an error rate high enough to swallow an entire range and reach into the next range, how is that enough to show that errors are not highly likely? Because, again, it will depend, obviously, on what the temperature shown on the device is. If the temperature is 98 degrees or 99 degrees or even 100 degrees, those might be swallowed up. If the temperature shown is higher than that, then depending on what the range is, it's very important. So the fact that they have established a more narrow range and the review claims that there are going to be high numbers of false positives at higher temperatures is what's going to be inaccurate in their statements. And how is doing a study with 10 people under optimal conditions when they sat for 20 minutes before they were screened, how does that translate into showing how people coming in off the street, moving in a lobby, how the device works for them? Does it even translate to that? That's going to be a technical question that I don't know enough about to answer. But if that's the only facts you've pleaded to establish falsity, I'm not sure you pleaded falsity. You established it under ideal conditions. The contention is that it doesn't work in the real world. This is going to be used in building lobbies for people coming off the street. They don't sit for 20 minutes outside before they come in. And you didn't show anything about how it works in the real world. So you didn't establish, you didn't plead facts to show it was false. Well, that was only one of the contentions in the IPVM reviews. There are other ones that, for instance, the licensing and the number of false positives that would be shown in the complaint would be alleged properly. When you say number of false positives, was there ever a precise number specified by IPVM? There was not. So I don't know where that word number came from then and what you just said. They said false positives and negatives are highly likely, but I'm not sure they gave a number or even a percentage. I'm not sure either, Your Honor. Are you still there? Yes, Your Honor. That was an answer to my question. I apologize. I'm also not sure. I would be required to examine the record in more depth. I don't recall at this time. Mr. Zami, why don't you go on with the next point in your argument? Thank you, Your Honors. If there are no further questions, I'll submit on the brief. Did Fletcher have any questions? No. I hear none from Judge Fletcher or Judge Collins. I have no questions. We will return to the rebuttal argument. Thank you, Your Honors. I'll be brief. Counsel for Appellee, as they did in their brief on appeal, focuses again or refers to again this sort of serious tone of the articles. I think what I want to emphasize here is that under this Court's precedent in Gardner v. Bartino, context is key. In fact, as the Court held in Knievel, context itself can be dispositive of whether or not a statement is actionable in defamation. And here, the context again makes abundantly clear that what a reader is getting is a statement of a set of facts and then IPVM's conclusions based on those facts. In fact, that's what readers go to this website for. To respond to a question that was posed to Appellee, I point the Court to the record site ER 253, which is the portion of the relevant article concerning false positives and negatives are highly likely. I want to point out to the Court that what my client said in that article was that because the forehead and face are highly susceptible to variations caused by environment and activities of the person being screened, e.g. exercising or consuming alcohol, combined with the limited accuracy FLIR 1 Pro camera, false positives and negatives are highly likely. So, again, that's a statement, a conclusion, drawn on expressly stated facts. Can I just ask you real quickly, what is your response to his assertion that the contention about breaching the license agreement is an issue of fact and that they have pleaded that it's false to say that it breaches the license agreement to use the device in the particular way that they're using it? I have two responses to that, Your Honor. First of all, it is factually undisputed. It is true that the FLIR SDK prohibits license agreement, prohibits the FLIR SDK from being utilized for this purpose. Right, but they say they use the camera but not the SDK. That's correct, Your Honor, and, again, two responses to that. I think the gist is the same. The point that IPVM was making is that FLIR, the manufacturer of the camera, does not permit, prohibits the use of these cameras and prohibits the use of the FLIR SDK for this use case. That's the point of the argument. Are you saying the license agreement prohibits the use of the camera? Both the SDK or did I mishear you? I apologize, Your Honor. So the license agreement prohibits the use of the FLIR SDK. In its article, IPVM noted that it stated, a police position, that it didn't use the FLIR SDK to develop its software. It questioned that because access to the temperature readings that are given by the camera is what the FLIR SDK provides. But I also want to note as a matter of judicial notice, we cited in our opening brief, we referred the court to a parallel action that was filed by an appellee in the district court against FLIR,  or terminating its product supplier agreement. Because its product supply agreement, the relevant product supply agreement governing the party's relationship, also prohibited use of the FLIR One Pro camera for medical and health screening devices, including specifically human temperature detection. So the gist of the defamatory sting, if there is one, is that FLIR, the manufacturer of this camera, prohibits, does not recommend, and prohibits the use of the camera, as well as the SDK, the FLIR SDK, developing apps for this type of use case. So it's not clear to me how appellee can make an argument that this is somehow, one, that it's false, that the FLIR SDK prohibits this, or true, that even if it is false, it's somehow a defamatory, false statement of fact that is itself actionable or separately actionable. Maybe I'm misunderstanding what you just cited that case for. It sounds as though there's a dispute between X Labs and the software company as to what the license does or does not prohibit. No, Your Honor. I apologize if that's what I conveyed. There was a separate lawsuit that was filed by appellee against FLIR. It has since dismissed that lawsuit. That lawsuit is no longer pending. It made implied covenant and other business tort allegations against FLIR for terminating its product supply agreement for the FLIR One Pro camera for this use case. It did so in part, FLIR defended itself, in part, on the basis of the product supply agreement, which is a judicially noticeable document that was filed in that case, that expressly prohibits use of the FLIR One Pro camera for this use case. You say it explicitly prohibits. They defend it on the ground that it explicitly prohibits, but it sounds as though X Labs disagreed with that. X Labs did not make a breach of express contract claim against FLIR, so it actually didn't dispute that, perhaps, and I can only speculate why it decided to dismiss its case voluntarily. It may be that this other lawsuit doesn't teach us much one way or the other, then. I think, Your Honor, the point is that the FLIR SDK, to the extent my client said the FLIR SDK prohibits the use of a FLIR One Pro camera for this use case, instead of saying the FLIR SDK prohibits use of the FLIR SDK for this use case, it is a distinction without, I think, a meaningful difference because the point is that the camera itself should not, according to its manufacturer, FLIR, be utilized for this use case. Thank you, Your Honors. And if there are no additional questions, I would submit and ask the court reverse and remand with instructions for IPVM's motion to strike to be granted. Thank you. Okay, thank you. That case for the holdings, the IPVM, shall now be submitted.
judges: FLETCHER, GOULD, COLLINS